1  SALISBURY LEGAL CORP.
   Lawrence J. Salisbury (SBN 179748)
2  656 5th Ave., Suite R
   San Diego, California 92101
3  Telephone: (619) 241-2760
   Email: lsalisbury@salisburylegal.com
4
5  Attorneys for Plaintiff, individually, and all others similarly situated
6
7
8
9
10            **UNITED STATES DISTRICT COURT**
11          **NORTHERN DISTRICT OF CALIFORNIA**
12
13
14  Alexander Panelli,                    Case No. 3:24-cv-02748-SK
    individually, and all others similarly
15  situated                              **AMENDED CLASS ACTION
                                          COMPLAINT**
16              Plaintiffs,
17          v.
18  TARGET Corporation
19              Defendants.
20
21
22
23
24
25
26
27
28

COMES NOW, Plaintiff Alexander Panelli, individually and on behalf of himself and all others similarly situated ("Plaintiff") and brings this action against Defendant TARGET. ("TARGET," or "Defendant"), and alleges on information and belief, except those allegations, which are asserted on personal knowledge, as follows:

**JURISDICTION AND VENUE**

1.     On May 8, 2024, Defendant removed this action from the California Superior Court for the County of San Francisco to this Court pursuant to 28 U.S.C. § 1446 and 28 U.S.C. § 1453 (Dkt. No. 1). Defendant asserts in its Notice of Removal that this court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

2.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this District. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff. The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold deceptively advertised Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1446(a) because Defendant removed this action from the California Superior Court for the County of San Francisco.

**PARTIES**

4.    Plaintiff is a resident of San Diego, California.

5.    Plaintiff is informed and believes that TARGET is a foreign corporation, headquartered in Minnesota.  It operates and does business throughout the State of California, including San Francisco County.

**FACTUAL BACKGROUND**

6.    This is a Class Action, pursuant to Code of Civil Procedure § 382, on behalf of Plaintiff and other similarly situated members of the putative class who have purchased certain sheet sets from TARGET in California. Hereafter, the term "sheets" or "bed sheets" means, bedding materials commonly understood to be used on a bed to cover the mattress, or as a layer beneath blankets when these are used, or to cover pillows, or to cover or wrap a bedspread, quilt or other bed covering. The term includes but is not limited to a full set of sheets, an individual sheet, a set of pillowcases, a single pillowcase, a duvet or a bedspread/quilt.

7.    Plaintiff and others similarly situated were individuals who purchased sheets at TARGET locations in California that were advertised by TARGET as having a "thread count" of 600 or more. "Thread count" is not an advertising term or mere puffery but is one of the key elements in the marketing (and ultimately the pricing) of bedsheets. High thread counts have come to mean high quality sheets, whether they be "softer" or "supple" or "durable," or any other host of terms used by marketers like TARGET to suggest that a high thread count bedsheet is desirable and worth the significant extra cost associated with a high thread count. In fact, the price of a given bed set is proportionally tied to the thread count of that given bedsheet.

8.    Thread count is a very specific term used worldwide as it relates to the actual thread count of a particular textile. The globally accepted measurement test for thread count is the test known as the "ASTM D 3775 method for thread count." ASTM, Inc. -- originally known as The American Society for Testing and Materials -- was formed in 1898. The Federal Trade Commission, which is tasked with enforcing textile labeling in the United

States (See, for example, The Textile Products Identification Act, 15 U.S.C. § 70, et seq. ("§ 70e. Enforcement (a) Except as otherwise specifically provided herein, this subchapter shall be enforced by the Federal Trade Commission under rules, regulations, and procedure provided for in the Federal Trade Commission Act (15 U.S.C. 41, et seq.))" Although the ASTM has no regulatory authority, as the most widely accepted international body regarding the regulation of textiles in all aspects, the FTC has regularly encouraged the use of ASTM standards for determining whether a particular textile is properly marketed or advertised. Thus, for example, in 2002, the ASTM requested an advisory opinion from the FTC on ASTM's recommended thread count testing method. The FTC was unable to issue an advisory opinion in that context for unrelated reasons but confirmed that any representation regarding "thread count" must have a "reasonable basis" and affirmed that it would give a test like the test recommended by the ASTM "great weight" in determining whether an advertiser has met its "substantiation burden." See Exhibit 1, Letter from FTC to ASTM dated March 18, 2002, at p.2, para. 1.

9.     Several years later, the FTC again opined on the use of ASTM testing standards as regards the proper method of determining thread count. In an August 2, 2005, letter, the FTC responded to an inquiry from the Chairman of the Textile Bedding Committee of the National Textile Association about whether a relatively new industry method of thread counting (which not coincidentally dramatically increased the thread count of a given textile) provided a "reasonable basis" to advertise an increased thread count which resulted from that new counting method. The FTC in essence rejected the newer method of thread counting and endorsed the ASTM D 3775 test: "A representation about thread count, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we consider what experts in the field believe is appropriate, including whether there are relevant consensus-based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we give such procedures or practices great weight in determining whether the advertiser has met its substantiation

4

burden." See Exhibit 2, Letter from FTC to Mr. E. Linwood Wright, Ill, Chairman, Textile Bedding Committee, National Textile Association, p. 2, para. 2.

10.    In fact, the FTC went further, and determined that the new testing method at issue in that letter could deceive or mislead consumers "by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: '300 thread count, 2 ply yarn.' A representation of '600 thread count' for this same product would likely mislead consumers about the quality of the product being purchased." Exhibit 2 at p. 2, para. 3.

11.    Thus, use of the FTC endorsed ASTM D 3775 thread count testing method is the industry standard and one of the primary bases upon which the FTC would determine whether or not a "reasonable basis" exists for an advertisers' thread count representations. The specifics of the ASTM D 3775 test method is beyond the scope of this complaint, but is attached hereto as Exhibit 3 in its entirety.[1] While the ASTM D 3775 test does not specify the exact physical method of counting individual threads, there are several methods of doing so, all of which yield equivalent results.

12.    A textile thread count can be assessed by measuring one inch on both the warp and weft sides and then counting all of the yarns within that square inch. Warp is the long yarn that runs vertically up and down the roll of fabric, this governs the vertical pattern repeat. Weft is the yarn that passes horizontally across the fabric roll, generally is shorter, and governs the horizontal pattern repeat. In other words, adding the number of threads in

---

[1]The American Society of Testing Materials (ASTM) describes the industry-standard method for counting yarns in their published test method: The fabric count is described by ASTM as: count, n—in woven fabric, the number of warp yarns (ends) and filling yarns (picks) per unit distance as counted while the fabric is held under zero tension and is free of folds and wrinkles.

According to the industry standard, the method for counting yarns includes the count of the number of warp yarns (ends) over 25 mm (1 in.) of fabric width in five randomly designated places across the width of the laboratory sampling unit. Then, one should successively count the number of filling yarns (picks) over a 25 mm (1 in.) length in five different random places along the length of the laboratory sampling unit (see 9.1.1 and 9.1.2).

1  both the warp and welt of one square inch of fabric yields the most accurate thread count of

2  bedsheets.

3      13.    Another process is to cut out a one square inch of fabric and then counting all

4  the yarns (both the warp and the weft) within the square inch.

5      14.    By whatever method, a proper thread count is important information for a

6  potential consumer for many reasons, but primary among them is the perceived value

7  inherent in considering whether to buy a higher thread count bedsheet. Thread count is a

8  primary driver of the pricing of bedsheets. Plaintiff intends to provide expert testimony

9  demonstrating on an industry basis that the pricing trend of bedsheets rise in direct

10  proportion to thread count and its perceived superior quality. But that issue has already been

11  addressed by previous courts considering the issue. *Hawes v. Macy's Stores W., Inc.*, No.

12  1:17-CV-754, 2022 WL 194407, at *16 (S.D. Ohio Jan. 22, 2022) (The record reflects

13  "more than enough" evidence demonstrating thread count as a significant factor in

14  'consumers' choice of bedsheets.").

15      15.    In the case of the Plaintiff in this case, he was in particular interested in a

16  higher thread count in shopping for replacement sheets. He researched both brick-and-

17  mortar stores and on-line retailers. After extensive research, he determined that pricing as it

18  related to thread count were material factors in his choice, and he eventually purchased

19  bedsheets from TARGET that he understood were higher priced than other TARGET

20  bedsheet options, but that he believed were priced for their higher thread count. In

21  particular, he purchased a "100% cotton" queen sheet set of "Threshold Signature" sheets

22  with a thread count of 800, which were distributed by TARGET Corporation.  A copy of

23  Plaintiff's purchase receipt is attached as Exhibit 4. Pictures of the actual packaging are

24  below, as well as the current representation on the TARGET website.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






Amended Class Action Complaint- 3:24-cv-02748-SK

16.    That sheet set is still available at TARGET is advertised as an "800 Thread Count," 100% cotton sheet set, as it is on the packaging of Plaintiff's purchase.

17.    Based on the representations on the bedsheet packaging and labeling regarding the 800 Thread Count, 100% cotton sheets, Plaintiff opted to purchase them for a higher price than other bedsheets without the same purported qualities that were also for sale at TARGET. But for the 800 Thread Count, 100% cotton representation, Plaintiff would not have purchased the bedsheets. Plaintiff Panelli saw and relied on the "800 Thread Count" claim on the label of the Product. Plaintiff Panelli would not have purchased the Product, or would have paid less for the Product, had he known that the products have a lower than advertised thread count. As a result, Plaintiff Panelli suffered injury in fact when he spent money to purchase the Product he would not have purchased, or would have paid less for, absent Defendant's misconduct. Plaintiff Panelli desires to purchase the Product again if the labels of the products were accurate and if the Products actually had the advertised thread count. However, as a result of Defendant's ongoing misrepresentations, Plaintiff Panelli is unable to rely on the Products' advertising and labeling when deciding in the future whether to purchase the Products.

18.    Independent testing of the bedsheets purchased by Plaintiff, using the guidelines recommended by the FTC under the ASTM D 3775 guidelines, confirmed that the bedsheet set purchased by Plaintiff did not have an 800 thread count but instead had a thread count of 168 x 120, or a total thread count of 288, which is 64% lower than the advertised thread count of 800. This testing was performed in January 2024, at an lab in the United States by an expert who is knowledgeable in thread counting methodology. The testing followed the standard method of testing Warp End Count and Filling Pick Count of Woven Fabric, D3775 ± 03a. The test used Method C: Traversing thread counter, using equipment specifically designed for this test.

19.    The bed sheet set purchased by Plaintiff was substantially similar to all other 100% cotton sheets with an advertised thread count of 600 or higher sold by TARGET during the class period. There are many other bed sheet sets sold by TARGET which

Amended Class Action Complaint- 3:24-cv-02748-SK

advertise similar thread counts. By way of example, and not meant to be an exhaustive listing of all high thread count sheets which TARGET markets with false thread counts, TARGET offers for sale in its stores, and the TARGET website currently offers for sale, various high thread counts sheets.

20.    For example, TARGET markets offers for sale a 5-Star Luxury Sheet Set 600 Count 100% Cotton Sateen, under the brand name California Design Den, also distributed by the TARGET Corporation pictured below[2]:



---

[2] (https://www.target.com/p/5-star-luxury-sheet-set-600-thread-count-100-cotton-sateen-soft-crisp-bed-sheets-with-deep-pockets-by-california-design-den/-/A-79313593?preselect=79313619#lnk=sametab)

21.    As a further example, TARGET currently markets and sells a "Premium Cotton 1000 Thread Count" sheet set composed of 100% cotton, pictured below[3]:



Sponsored

Target / Home / Bedding / Sheets & Pillowcases

Shop all Blue Nile Mills

**Premium Cotton 1000 Thread Count Solid Deep Pocket 4 Piece Bed Sheet Set by Blue Nile Mills**

★★★★☆ 11 ∨ | 2 Questions

● In stock · Online only




● ○

**$164.00** reg $205.00
**Sale** save $41.00 (20% off)
When purchased online ⓘ

size **king** Size chart

queen | olympic queen | **king** | full | ...

22.    Plaintiff's bedsheet purchase is typical of high thread count sheets sold by TARGET. There are many other bedsheets sold by TARGET which advertise similar misleading thread counts.

---

[3] https://www.target.com/p/premium-cotton-1000-thread-count-solid-deep-pocket-4-piece-bed-sheet-set-by-blue-nile-mills/-/A-83436779?preselect=83436796#lnk=sametab

23.    As another example, TARGET currently markets and sells a 1200 thread count 100% cotton sheet set, pictured below[4]:



Shop all Blue Nile Mills

**1200-Thread Count Cotton Deep Pocket Sheet Set - Blue Nile Mills**

★★★★☆ 36 ⌄    11 Questions

● In stock · Online only

**$176.80** reg $208.00
**Sale** save $31.20 (15% off)
When purchased online ⓘ

size **queen**  Size chart

| king | **queen** | california king | full |

color **sage**

24.    On information and belief, any marketing or advertising of 100% cotton bedsheets consisting of a thread count of 600 or higher is false and misleading. This is so because it is physically impossible for cotton threads to be fine enough to allow for 600 or more threads in a single square inch of 100% cotton fabric. Thus, all of the 100% cotton sheet sets advertised or otherwise marketed by TARGET that claim a thread count of 600 or

---

[4] https://www.target.com/p/1200-thread-count-cotton-deep-pocket-sheet-set-blue-nile-mills/-/A-81523593?preselect=81523610#lnk=sametab

higher are falsely advertised, including but not limited to the bedsheets purchased by Plaintiff here.

25.    Moreover, the false thread count issue is not new to TARGET, which was well aware of the simple fact that only a certain number of threads could physically fit into one square inch of fabric. As part of its "Product Safety & Quality Assurance" program, TARGET claims that: "Product and food safety is a top priority, and we make sure our products and how they are produced meet or exceed mandatory safety standards. Frequently, we require TARGET-brand vendors to test beyond regulatory requirements and take special care with children's products and toys. We expect our vendors to comply with good manufacturing practices or documented manufacturing and quality processes. We also require TARGET-brand products be tested at third-party testing labs."[5]

26.    TARGET further claims that it has "tools and processes in place to address product safety and assure quality at every stage of production. Before production starts, we audit the factory and meet with the vendor and manufacturer. We require vendors to test TARGET-brand products at third-party laboratories throughout production. A TARGET-brand product must pass all testing before it's approved for shipment."

27.    Assuming TARGET actually complies with its own publicly stated policies, TARGET was likely well aware of the incorrect thread count in all of its bedsheets with a thread count of 600 or higher.

28.    Moreover, other independent sources, and even TARGET competitors, recognized the thread count issue and advertise their products honestly, and without deceptively high false thread counts.

29.     "Thread count is the number of vertical and horizontal threads per square inch. Not long ago, sheets typically had thread counts of 120 with 60 horizontal and 60 vertical threads. In the 1960's, a sheet with a 180-thread count was considered a luxury. "Now you see 1,000 thread count sheets, but you just can't get that many threads on a

---

[5] Product Safety and Quality Assurance | Target Corporation

Amended Class Action Complaint- 3:24-cv-02748-SK

loom," says Pat Slaven, a textile expert at Consumer Reports. To get that higher number, manufacturers use thinner strands of fabric twisted together as if they were one. Then they double, triple or even quadruple the thread count to make the number more attractive to the consumer. "It ups the count but doesn't give you a better sheet," says Slaven. "The sweet spot is 400."[6]

30.    "There's a maximum number of threads that can fit into a square inch of fabric," explained Scott Tannen, CEO of Boll & Branch, a luxury linen provider. Depending on the type of cotton used, that number is generally not more than 400. So, there is an awful lot of interesting math involved in the sheets you see in a department store that can be up to a 1,200-thread count.[7]

31.    In a previous study, seven out of eight sheets tested by the Good Housekeeping Institute flunked thread count tests. "There are telltale ways to spot an exaggerated count…When Good Housekeeping analyzed sample sheets, it found manufacturers exaggerating their thread count by three to five times. They found one sheet that was labeled as having a 1,500-thread count, but it actually only had 300 threads per square inch."[8]

32.    "You may see sheets with thread counts well over 1,000 on store shelves, but this is likely due to manipulative marketing. Keep in mind that there are only so many threads that can physically fit into a square inch of fabric."[9]

---

[6] *Higher thread count doesn't guarantee better sheets,* Consumer Reports (Sept. 13, 2023), *available at* https://www.consumerreports.org/cro/news/2013/09/higher-thread-count-doesn-t-guarantee-better-sheets/index.htm

[7]https://www.businessinsider.com/guides/home/best-thread-count-for-sheets#:~:text=A%20regular%20ply%20300%20thread,the%20package%2C%22%20Tannen%20said

[8] *The Truth Behind Thread Counts*, ABC NEWS (March 21, 2006), *available at* https://abcnews.go.com/GMA/Moms/story?id=1751253&page=1

[9] https://www.pimacott.com/blog/thread-count-faq-myths-facts

33.    "Thread Count refers to the number of threads woven into one square inch of fabric. But in reality, there is more to the story than tallying the warp and welt and deeming a fabric as "luxury". Only so many threads can fit into a one square inch. When it comes to bed linen, 400 threads per square inch, is about all that will fit into that space. Unfortunately, some mills engage in some creative counting to achieve 1,000-plus thread count numbers."[10]

**Plaintiff and the Putative Class Members Suffered Economic Injury**

34.    Plaintiff and the putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. With all the other sheet products on the market with accurate thread count claims, a reasonable consumer would choose to purchase a product without inflated thread count claims.

35.    Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Products that were falsely labeled and advertised. Consumers, including Plaintiff, would not have purchased Defendant's Products, or would have paid less for the Products, if they had known the Products have an inflated thread count. Defendant charges a premium for the Products. Because Defendant represents that the Products have a thread count in excess of 600, such as a "800 Thread Count," Defendant is able to charge consumers more money for the Products. Sheet products with advertised thread counts between 200 and 300 sell for a much lower price than the TARGET Products that are sold with a false thread count claim.

36.    For example, Plaintiff Panelli spent $95.00 on the TARGET product that he purchased labeled as having a "800 Thread Count." Bed sheet products with advertised thread counts between 200 and 300 sell for a much lower price than the TARGET Products

---

[10] https://www.loomlux.com/our-fabrics

Amended Class Action Complaint- 3:24-cv-02748-SK

that are sold with inflated thread count claims. For example, a Egyptian cotton "300 Thread Count" queen size bed sheet set is sold at Bed Bath & Beyond for $59.49 as shown below[11]:



37.     As another example, a 200 thread count queen size cotton sheet set is sold at Bed Bath & Beyond for $43.49 as shown below[12]:



---

[11] https://www.bedbathandbeyond.com/c/bed-sheets-pillowcases/bed-sheet-sets?t=9&featuredproduct=4662568&featuredoption=6345045&ci_sku=12585284-000-028&cnc=US&cid=323885&type=pla&targetid=&track=pspla&utm_source=google&utm_medium=pspla&gad_source=4&gclid=Cj0KCQjw3ZayBhDRARIsAPWzx8rlrznOaJaKhbm6RDe4LD_yOIvsgUAtYQDGM_ojQJofPrGaZz1lW9IaApnJEALw_wcB

[12] https://www.bedbathandbeyond.com/c/bed-sheets-pillowcases/bed-sheet-sets?t=9&featuredproduct=33140254&featuredoption=61725808&ci_sku=37615464-000-009&cnc=US&cid=323885&type=pla&targetid=&track=pspla&utm_source=google&utm_medium=pspla&gad_source=4&gclid=Cj0KCQjw3ZayBhDRARIsAPWzx8p6162TM5OHAMQxxkdgomXZ2ARQ1QVXqEqnpRUTO2QSsWqBZ4PsdNAaApaQEALw_wcB

1    38.    A 300 thread count cotton queen size sheet set is sold at Walmart for $38.97

2 as shown below[13]:

3

4

5



6

7

8

9

10

11

12



13                    **NO ADEQUATE REMEDY AT LAW**

14    39.    Plaintiff and members of the class are entitled to equitable relief as no

15 adequate remedy at law exists. The statutes of limitations for the causes of action pled

16 herein vary. Class members who purchased the Products more than three years prior to the

17 filing of the complaint will be barred from recovery if equitable relief were not permitted

18 under the UCL.

19    40.    The scope of actionable misconduct under the unfair prong of the UCL is

20 broader than the other causes of action asserted herein. It includes Defendant's overall

21 unfair marketing scheme to promote and brand the Products, across a multitude of media

22 platforms, including the product labels, packaging, and online advertisements, over a long

23 period of time, in order to gain an unfair advantage over competitor products. Plaintiff and

24 class members may also be entitled to restitution under the UCL, while not entitled to

25 damages under other causes of action asserted herein (e.g., the CLRA is limited to certain

26 types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or

27 ─────────────────────────

[13] https://www.walmart.com/ip/Better-Homes-Gardens-100-Cotton-Sateen-300-Thread-Count-Sheet-Set-Twin-Bashful-Blooms-Cool/5181102331

28

services for personal, family, or household purposes) and other statutorily enumerated conduct).

41.     A primary litigation objective in this litigation is to obtain injunctive relief. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Products as having a higher thread count than they actually have. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures or halting the sale of unlawful sold products is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements stating the actual thread counts of the products. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation has not yet completed, rendering injunctive relief necessary. Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

42.     It is premature to determine whether an adequate remedy at law exists. This is an initial pleading and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves the right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where

no adequate legal remedies are available for Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action on behalf of himself, and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure §382.23(b)(2) and 23(b)(3).  Plaintiff seeks to represent a class composed of and defined as follows:

> All individuals in California who purchased TARGET's sheet sets that were advertised and marketed as being comprised of 100% cotton with a thread count of 600 or higher, for personal use from four years prior to the filing of the complaint until the date class notice is disseminated. (collectively referred to as the "Class").

44.    Excluded from the Class are: (i) Defendant and its officers, directors, and employees of TARGET and the legal representatives, heirs, successors and assigns of; (ii) any excluded person. who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendants.

45.    Plaintiff reserves the right to amend, modify, or otherwise alter the class description with greater specificity or further division or definition, presented to the Court at the appropriate time, or to propose or eliminate subclasses or limitation to particular issues, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

46.    The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

47.    Numerosity:  The potential members of the Class as defined Members are so numerous that joinder of all members of the Class is impracticable.  While the precise number of members of the Class has not been determined at this time, Plaintiff is informed and believes that TARGET has sold Plaintiff and the putative class members thousands of

sheets in the last four years in California that were marketed as containing 100% cotton with a thread count of 600 or higher to consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

48. <u>Commonality</u>:  There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to all members of the Class which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.) Whether TARGET made or makes misrepresentations and/or omissions of material fact regarding the thread count of its 100% cotton sheets with thread counts of 600 or higher;

b.) Whether statements made by TARGET in its advertising, marketing, packaging or labeling were false and misleading;

c.) Whether TARGET is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

d.) Whether TARGET's misconduct set forth in this Complaint demonstrates that it engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

e.) Whether TARGET made or makes misrepresentations as to 100% cotton sheets containing thread counts of 600 or higher which constitute breaches of express and/or implied warranties; concerning the Products at issue that were likely to deceive the public;

f.) Whether TARGET's conduct injured Plaintiff and class members; and

g.) Whether Plaintiff and class members are entitled to damages or other injunctive relief; and

h.) Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

49. <u>Typicality</u>:  The Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims herein alleged are typical of those claims which could be

1    alleged by each Class Member in that every member of the Class was susceptible to the

2    same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief

3    under the same causes of action as the other Class Members.

4        50.    Adequacy: Plaintiff is an adequate Class representatives because Plaintiff's

5    interests do not conflict with the interests of the Class Members Plaintiff seeks to represent;

6    the consumer fraud claims are common to all other members of the Class, and Plaintiff has a

7    strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent

8    and experienced in complex class action litigation and Plaintiff intends to vigorously

9    prosecute this action. Plaintiff has no interests which conflict with those of the Class. The

10    Class Members' interests will be fairly and adequately protected by Plaintiff and proposed

11    Class Counsel. Defendant has acted in a manner generally applicable to the Class, making

12    relief which would be sought by members of the Class in appropriate with respect to

13    Plaintiff and the Class Members. The prosecution of separate actions would create a risk of

14    inconsistent and varying adjudications.

15        51.    Superiority of Class Action: A class action is superior to the other available

16    means for the fair and efficient adjudication of this controversy because the joinder of all

17    members of the Class is not practicable, and questions of law and fact common to the Class

18    predominate over any questions affecting only individual members of the Class.  Each

19    member of the Class has been damaged and hundreds of individual Class Members is

20    impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation

21    resources;

22        a.) The individual claims of the Class Members may be relatively modest compared

23            with the expense of litigating the claim, thereby making it impracticable, unduly

24            burdensome, and expensive to justify individual actions;

25        b.) When TARGET's liability has been adjudicated, all Class Members' claims can

26            be determined by the Court and administered efficiently in a manner far less

27            burdensome and expensive than if it were attempted through filing, discovery,

28            and trial of all individual cases;

c.) This class action treatment will allow those similarly situated persons to litigate their claims in the manner that will promote orderly, efficient, and appropriate adjudication and administration of Class claims;

d.) Plaintiff is unaware of any difficulties likely to be encountered in the management of this action that would preclude its maintenance as a class action;

e.) This class action will assure uniformity of decisions among Class Members;

f.) The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

g.) Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

52.    Additionally, or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

53.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

54.    Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendants will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## **FIRST CAUSE OF ACTION**

### **(Violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, et seq.)**

55.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

56.    Under the UCL "unfair business competition" include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200. The application of the UCL is a strict liability standard. Whether or not TARGET intentionally or negligently engaged in any unlawful, unfair or fraudulent business practices, they are liable if those practices occurred.

57.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

58.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

59.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

60.    As alleged above, TARGET advertising, marketing and sales of 100% cotton sheets or pillowcases with a thread count of 600 or higher violates all three prongs of the UCL.

61.    It is unfair in that it is substantially injurious to consumers, and the harm to Plaintiff and Class members outweighs any utility of TARGET's practices.

62.    It is fraudulent because it is likely to deceive members of the public, including the Class.

63.    It is unlawful because it violates several other laws or regulations, including, but not limited to:

a.) TARGET advertising, marketing and sales of 100% cotton sheets or pillowcases with a thread count of 600 or greater violates Cal. Bus. & Prof. Code § 17500's prohibition against false advertising.

b.) It violates The Federal Trade Commission's Act ("FTCA") prohibition against "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and the dissemination of any false advertisements. 15 U.S.C. § 52(a).

c.) It also violates the Consumers Legal Remedies Act, Civil Code § 1750, et seq., in multiple ways, and at least as follows: violation of Section 1770(a)(5) which prohibits "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. Violation of Section (a)(7) which prohibits "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." And violation of Section (a)(9) which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

64. Plaintiff relied on TARGET's fraudulent and deceptive representations and these misrepresentations played a substantial role in Plaintiff's decision to purchase the products, and Plaintiff would not have purchased those products without Barneys' misrepresentations.

65. TARGET's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Class members and the public will be deceived into purchasing products based on false thread count representations.

66. These false representations led to financial damage for consumers like Plaintiff and the Class.

67. Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order TARGET to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and the Class of all TARGET's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

### Violations of California's Consumers Legal Remedies Act

### Cal. Civ. Code § 1750 *et seq.*

68.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

69.    Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendants.

70.    At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

71.    At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

72.    At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

73.    The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

74.    Defendant disseminated, or caused to be disseminated, through its advertising, false and misleading representations, including the Products' labeling that the Products have a certain thread count. Defendant failed to disclose that the Products have a lower than advertised thread count. For example, Products labeled as having a "800 Thread Count" only have a thread count of 288 threads. This is a material omission as a reasonable consumer would find the fact that the Products have a lower than advertised thread count to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a.) Defendant represented that the Products have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b.) Defendant represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c.) Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d.) Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

75.    Defendant violated the CLRA because the Products were prominently advertised as having a certain thread count, but, in reality, the Products have a lower than advertised thread count. Defendant knew or should have known that consumers would want to know the actual thread count of the Products. For example, Defendants placed the thread count representation on the front of the packaging. Defendant had exclusive knowledge of the actual thread counts of the Products, and Defendant failed to disclose this fact. Defendant actively concealed this material fact. The fact that the Products have a lower than advertised thread count is material to consumers because reasonable consumers would deem this fact important in determining whether to buy the Products.

76.    Defendant's actions as described herein were done with conscious disregard of Plaintiff and the Class members' rights and were wanton and malicious.

77.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

78.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein, and for restitution, disgorgement, actual damages, punitive damages, and attorneys' fees and costs.

79.    Pursuant to California Civil Code section 1782, Plaintiff notified Defendant in writing by certified mail of the alleged violations of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. Defendant has failed to rectify the problems

1   associated with the actions detailed herein and give notice to all affected consumers within

2   30 days of the date of written notice pursuant to section 1782 of the CLRA.

3      80.     Pursuant to section 1780(d) of the CLRA, an affidavit showing that this action

4   was commenced in a proper forum is attached hereto.

5                                   **PRAYER**

6      WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and

7   judgment against TARGET as follows:

8      1.      Declaring that this action is a proper class action, certifying the Class as

9   requested herein, designating Plaintiff as the Class Representative and appointing the

10  undersigned counsel as Class Counsel;

11     2.      Ordering restitution and disgorgement of all profits and unjust enrichment that

12  Defendant obtained from Plaintiff and the Class members as a result of Defendant's

13  unlawful, unfair, and fraudulent business practices;

14     3.      Order payment to the class of the unjust enrichment earned by TARGET by

15  selling products that were not constituted as represented and thus were sold for a higher

16  price than they would have been otherwise.

17     4.      Ordering injunctive relief as permitted by law or equity, including enjoining

18  Defendant from continuing the unlawful practices as set forth herein, and ordering

19  Defendant to engage in a corrective advertising campaign;

20     5.      Ordering damages in amount which is different than that calculated for

21  restitution for Plaintiff and the Class;

22     6.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and

23  the other members of the Class;

24     7.      Ordering Defendant to pay both pre- and post-judgment interest on any

25  amounts awarded; and

26     8.      Ordering such other and further relief as may be just and proper.

27

28

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: May 24, 2024                                    SALISBURY LEGAL CORP.


By: */s/Lawrence J. Salisbury*
Lawrence J. Salisbury (SBN 179748)
656 5th Ave., Suite R
San Diego, California 92101
Telephone: (619) 241-2760
Email: lsalisbury@salisburylegal.com

**Affidavit Pursuant to Civil Code Section 1780(d)**

I, LAWRENCE SALISBURY, declare as follows:

1.    I am an attorney duly licensed to practice before all of the courts of the State of California. I am the counsel of record for Plaintiff.

2.    This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3.    Defendants TARGET has done, and is doing, business in California, including in this county. Such business includes the marketing, promotion, distribution, and sale of the Products at issue within the State of California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed May 24, 2024, at San Diego, California.

SALISBURY LEGAL CORP.

By: */s/Lawrence J. Salisbury*
Lawrence J. Salisbury (SBN 179748)
656 5th Ave., Suite R
San Diego, California 92101
Telephone: (619) 241-2760
Email: lsalisbury@salisburylegal.com